|  | FILED |
|---|---|
|  | 07/14/2021 |
|  | Clerk of the |
|  | Appellate Courts |

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 1, 2021 Session

## PENNY LAWSON, ET AL. v. HAWKINS COUNTY, TN, ET AL.

### Appeal from the Circuit Court for Hawkins County
#### No. 20-CV-37      Alex E. Pearson, Judge

---

### No. E2020-01529-COA-R3-CV

---

This appeal arises from litigation concerning a fatal road accident. Steven W. Lawson ("Decedent"), by and through his wife, Penny Lawson, and on behalf of Corey Lawson, Decedent's child ("Plaintiffs," collectively), sued the Hawkins County Emergency Communications District Board ("ECD-911"), Hawkins County, Tennessee and Hawkins County Emergency Management Agency ("the EMA") ("Defendants," collectively) in the Circuit Court for Hawkins County ("the Trial Court") alleging negligence, gross negligence, and recklessness in Defendants' response to a road washout that led to Decedent's death. Plaintiffs specifically alleged nepotism in Defendants' hiring practices and a failure to train. Defendants filed motions for judgment on the pleadings, which the Trial Court granted partly on grounds that claims of recklessness could not proceed against the Defendant entities under the Governmental Tort Liability Act ("the GTLA"). Plaintiffs appeal. We hold that Plaintiffs could, in fact, proceed with their claims of recklessness and gross negligence under the GTLA, and the facts pled by Plaintiffs were sufficient to state claims based upon recklessness and gross negligence. We hold further that, based on the facts alleged at this stage, the third special duty exception to the public duty doctrine applies so as to remove Defendants' immunity. We reverse the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Thomas J. Seeley, III, and Brett N. Mayes, Johnson City, Tennessee, for the appellants, Penny Lawson and Corey Lawson.

Russell W. Adkins, Kingsport, Tennessee, for the appellee, Hawkins County Emergency Communications District Board.

Jeffrey M. Ward, Greeneville, Tennessee, for the appellees, Hawkins County, Tennessee and Hawkins County Emergency Management Agency.

## OPINION

## Background

In February 2020, Plaintiffs sued Defendants in the Trial Court. Certain individual public officials also were sued but later were dismissed for redundancy.[1] Plaintiffs' lawsuit stemmed from Decedent's February 21, 2019 death in a motor vehicle accident. Decedent died from injuries sustained while driving on a state highway that washed out in a storm. In their complaint, Plaintiffs alleged that Decedent's death was caused by "Defendants' gross negligence, recklessness, and failure to take immediate and direct action in response to the substantial risk of catastrophic injury and/or death due to the collapse of Highway 70 on Clinch Mountain."

As to the details of the incident, Plaintiffs alleged the following: that Decedent was rounding a switchback curve on the mountain when, at 1:45 a.m., he drove into a chasm where Highway 70 had been; that Johnny Mabe, another motorist travelling behind Decedent, was injured when he too drove into the chasm; that earlier, at 12:58 a.m., motorist Alexis Raebel contacted ECD-911 to advise that trees were down on the highway and the highway was cut off; specifically, that "if someone's going up the mountain … they're going to go off the road"; that Dispatcher Dylan Wood "stacked" the call since the would-be responding officer Michael Godsey was already on a vehicle stop; that Godsey arrived at the scene before 1:13 a.m.; that Godsey called ECD-911 and "casually" discussed the situation with Dispatcher Caitlin Smith; no action was taken then to shut down the highway or undertake any other preventative measures.

Continuing our review of Plaintiffs' allegations, Plaintiffs stated that at 1:21 a.m., Dispatcher Smith called Danny Jones of the Tennessee Department of Transportation; that ECD-911 Director Murrell withheld this recording; that at 1:22 a.m., Dispatcher Smith called then-Director Gary Murrell of the EMA to advise him of the situation; that Murrell advised Dispatcher Smith to contact the Holston Electric Company regarding the downed power pole; this recording, too, has been withheld by ECD-911; Director Gary Murrell arrived on the scene at 3:07 a.m. that morning; that at 1:30 a.m., Dispatcher Smith called Holston Electric Company; that at 1:46 a.m., Officer Godsey contacted ECD-911 to advise that a vehicle hit a rock embankment and flipped over multiple times down the mountain. Only shortly thereafter did any official consider closing the highway.

[1] These officials were Ronnie Lawson, Sheriff of Hawkins County, Tennessee; Rita "Gay" Murrell, Director of ECD-911; and Jamie Miller, Director of the EMA, all sued in their official capacities. The dismissal of these individual defendants is not at issue on appeal.

Certain exhibits were attached to Plaintiffs' complaint. One exhibit was a transcript of citizen Alexis Raebel's call to 911 Dispatcher Dylan Wood. It reads as follows:

Dispatcher: "911."
Caller: "Yeah, is this 911 for Rogersville?"
Dispatcher: "It's Hawkins County, yes."
Caller: "Okay, uh, I'm on a phone that doesn't have minutes and this is the only way I could call … I live across Eidson and there are two trees (inaudible) the mountain and half the road is cut off."
Dispatcher: "Okay where at on, are you talking about 70?"
Caller: "Yes, on 70, when you're going up Clinch mountain."
Dispatcher: "Okay, are you talking about like after Cave Springs, er?"
Caller: "Yes."
Dispatcher: "Okay, like where exactly, I mean is it like just past Cave Springs? Or is it all the way through the *S* curves, er?"
Caller: "You just have to like go up the mountain …. There's two trees down when you, (sigh)…"
Dispatcher: "Okay, what's your, what's your name?"
Caller: "My name is Alexis Raebel, R-a-e-b-e-l."
Dispatcher: "Umkay, is it blocking the whole road?"
Caller: "Uh yeah, I almost went off of it, but, cause you can't really tell, but if somebody's going up the mountain, going like, towards town, they're going to go off the road."
Dispatcher: "Okay and what is your phone number?"
Caller: "[redacted]
Dispatcher: "Alrighty, I'll send someone out that way, ok."
Caller: "Okay, thank you."
Dispatcher: "You're welcome."

Another exhibit attached to Plaintiffs' complaint was a transcript of the phone conversation between Officer Michael Godsey and 911 Dispatcher Caitlin Smith. It reads as follows:

Dispatcher (0:02): "Central Dispatch."
Officer: "Hey can you hear me?"
Dispatcher: "Hey, I can hear you."
Officer: "Okay, uh, might want to let the highway department know that like this, this mudslide is still, like, it's still sliding, uh …"
Dispatcher (0:11): "It is still sliding?"
Officer (0:17): "Yeah, it's still, I mean it's slowly sliding but it's pushin trees, like that's already fell, like down the, down the road, but it's pushing it slow

-3-

and there's uh power pole here that's in the middle of the mudslide and we're just waiting on it to come down here in just a minute, cause it's, it's pushing the pole on down and the pole's swinging, so … I don't know if Holston Electric is gonna have to take care of that first, er, what's gonna happen on this."

Dispatcher (0:45): "Oh God, is it like a big mudslide?  Is it pretty big, er?"

Officer (0:48): "Yeah, yeah, it's a big mudslide, I mean it's not, it's, it's filled the bottom of this ditch but it's not up on the road.  But we don't know if the mudslide is come across the mountain up top over there, if we're gonna have to like, we're gonna have to wait until the trees get cleared out before we can drive up and see if, if, if it's coming on down the mountain."

Dispatcher (1:10): "Okay, we just notified Gary (Director of Hawkins County EMA).  I don't think he's coming out.  We have proof of protocol, but it's TDOT and they're out so they should be on the scene with you just any time and Dylan got ahold of Holston Electric, so as soon as they can make it out there."

Officer (1:25): "Okay, yeah, we're just waitin, I mean it's still, I mean it's sliding just like crackin and knockin trees down on the side of the road, here."

Dispatcher (1:33): "Oh my gosh.  If it was to get like bad and up in the road, just let us know for sure if it gets pretty bad cause … we'll still have to come out and notify everybody and do his thing that he does, um."

Officer (1:46): "It's a, it's a deep, deep ditch and this mud slid all the way down into the side of this ditch and, it's like, um, I mean, it's not going to get up on the road but it's sliding down (inaudible) trees coming on down the ditch, it's I mean, uh …"

Dispatcher (2:02): "Yeaaa, it's pretty big if it's pushin' trees down, you know it?"

Officer (2:05): "Well it's, it's pushed the trees down, the tree that's all the way across the road, it's pushin it dow-, it's pushin' it down the guardrail."

Dispatcher (2:12): "Oh my Goshhh.  You know one of these days, like the whole mountain is just gon' come down I feel like."

Officer (2:18): "Well, it's crazy that we (inaudible) were watching that power pole slide."

Dispatcher (2:23): "That is wild but they should be out there with you just any time.  I talked to Danny (TDOT) and he's up and moving so he should be pulling in I'd imagine anytime.  Cause they had went down to Caney Creek before and Dylan called Holston Electric so they should be on out too."

Officer (2:39): "Alright, I appreciate it."

Dispatcher (2:39): "Well, it's no problem.  If you need anything, just holler at us."

Officer (2:43): "Well, we are just going to wait and see if anything else falls

here."

Dispatcher (2:45): "Alright well don't let a rock fall on you or your car. (both laugh)"

Officer: "See ya."

Dispatcher: "Alright bye."

Plaintiffs asserted that Defendants' governmental immunity was removed, and that Defendants and their employees had engaged in reckless and grossly negligent conduct:

25.     Mr. Lawson was killed due to the reckless and grossly negligent conduct of all Defendants and their employees or agents as named herein, including but not limited to:

a.     Deputy Godsey's blatant failure to follow any protocol in assessing the situation, discussing options to close the Highway to prevent accidents, failure to communicate the danger to other motorists, conscious disregard to the unjustifiable and substantial risk of a vehicle falling off the mountain due to the collapse, and failure to take any action to stop traffic;

b.     ECD-911 employees' failure or blatant refusal to obtain more information, make additional dispatch calls to any fire department or other emergency personnel to report the situation on Highway 70, or follow proper protocol regarding unsafe road conditions.

c.     EMA employees' or agents' failure or blatant refusal to take any action at all other than to communicate a downed utility pole to the Utility Company, obtain any additional information, respond to the scene, assess the situation, or take any helpful action whatsoever.

***

27.     All Defendants were on notice and consciously aware that Highway 70 had an active mudslide, severe road hazard, trees in the road and a power pole was destabilized due to the mudslide for almost an hour before any attempt, whatsoever, was made to close Highway 70.

***

30.     This clear deviation from the standard of care that any ordinary person would exercise under the circumstances—said action being

-5-

performed by an ordinary citizen forty-five minutes earlier despite no law enforcement or emergency dispatch training of any kind—constitutes reckless conduct and gross negligence on the part of the Defendants' employees.

*****

32. The aforementioned actions constitute gross negligence and reckless behavior on the part of the Defendants and their employees because of their extreme dereliction in the operation of the Defendants' emergency procedures and protocols, and said neglect substantially and unjustifiably increased the risk that harm would occur to any motorist traveling southbound on Highway 70. Defendants' actions, through their employees and agents, was done with utter unconcern for the safety of these motorists and with reckless disregard for the rights, safety, and livelihood of others such as to amount to conscious indifference to the clear risk that would be confirmed later when Mr. Lawson and Mr. Mabe's vehicles fell off the mountain.

33. The aforementioned dereliction of duty on the part of the Defendants' employees, officers and agents was the result of, in part (but not limited to):

a. Blatant and rampant nepotism amongst the Defendants;

b. Failure to adequately train employees regarding proper protocol and procedures;

c. Failure to maintain adequate or proper protocols and procedures to deal with emergency situations such as the situation that occurred on February 21, 2019; and/or

d. Failure to maintain proper licensing under state law and regulations.

34. Immunity for all Defendants has been removed for this action pursuant to the provisions of T.C.A. § 29-20-203, -205, -108, etc., and said negligence constitutes negligence *per se* under these and other relevant statutes.

Plaintiffs concluded by asserting damages for the pecuniary value of Decedent's

-6-

life; Decedent's physical pain and suffering; emotional/mental pain and suffering; loss of enjoyment of life; Plaintiffs' loss of consortium; property damages; and funeral and burial expenses.

In March 2020, ECD-911 filed an answer to Plaintiffs' complaint. In its answer, ECD-911 asserted as defenses the public duty doctrine and the doctrine of governmental immunity. ECD-911 stated that "[Decedent's] death was unavoidable. The mudslide referenced in the Complaint was caused by an Act of God, and not by any acts or omissions of [ECD-911]." Hawkins County and the EMA filed their own separate but similar answer. In June 2020, ECD-911 filed a motion for judgment on the pleadings. Hawkins County and the EMA also filed their own motion for judgment on the pleadings. Both argued for immunity from Plaintiffs' lawsuit on the basis of the GTLA and the public duty doctrine.

In September 2020, the Trial Court heard Defendants' motions for judgment on the pleadings. In its October 2020 final judgment, the Trial Court granted Defendants' motions and dismissed Plaintiffs' lawsuit. The Trial Court incorporated in its final judgment its oral ruling wherein it stated as follows, in part:

> The Court looked closely at the complaint that was filed in this particular case. The Court believes that considering all the factual assertions as true and original inferences that may be drawn therefrom, the complaint does make out a cause of action or a claim, I should say, for recklessness. If you take all those facts and circumstances and you review that, I do believe that, whether or not anybody's conduct is reckless or not, certainly under the standard required for these motions to be granted on pleas, that they could make out a claim for recklessness.
>
> When I looked at the Governmental Tort Liability Act and I would read that in connection with the two Davidson County cases that I cited a few minutes ago [*Hughes v. Metro. Gov't of Nashville and Davidson Cnty.*, 340 S.W.3d 352; *Harp v. Metro Gov't of Nashville, 2014 WL 265713*], it's this Court's belief that reckless conduct just cannot move forward under the G.T.L.A. And, so, since reckless conduct cannot move forward -- and I'm not saying I agree or disagree with that particular provision, I'm merely saying as a matter of law or a legal matter, it doesn't appear to me that it can move forward under the G.T.L.A. with reckless conduct.
>
> So, since that is the case, that brings us down to the negligence claim and certainly the complaint asserts a negligence claim. I didn't mean to suggest otherwise. Certainly it does. So those do come under the Governmental Tort Liability Act. However, then we review that in light of the common law and the common law doctrine and the duty owed to the

community at large, in that particular situation here I think that all these individuals do have a duty to the public at large, and, again, I'm not saying I agree or disagree with the common law doctrine, but it certainly appears to this Court under the circumstances that a duty was owed to the public at large instead of to a specific individual. I can't find any basis in which anybody undertook to do any special duty or anything of that nature. I just don't see that in this case.

So with that being the circumstance, I believe that also prevents the plaintiffs from moving forward under the Governmental Tort Liability Act because -- I mean they can move forward under that, but then they're barred from recovery under the common law....

Plaintiffs timely appealed to this Court.

## **Discussion**

We restate and consolidate the issues raised on appeal into the following three dispositive issues: 1) whether the Trial Court erred in ruling that the GTLA precludes recovery against governmental entities for injuries proximately caused by the grossly negligent or reckless conduct of their employees within the scope of their employment under Tenn. Code Ann. § 29-20-205; 2) whether the Trial Court erred in finding that the facts pled were sufficient to state a claim based upon recklessness; and, 3) whether the Trial Court erred in its analysis of Plaintiffs' claims under the common law defense of the public duty doctrine and the special duty exception.

This case was resolved below on motions for judgment on the pleadings. "[A] motion for judgment on the pleadings is 'in effect a motion to dismiss for failure to state a claim upon which relief can be granted.'" *King v. Betts*, 354 S.W.3d 691, 709 (Tenn. 2011) (citations omitted). Our Supreme Court has instructed:

> In reviewing a trial court's ruling on a motion for judgment on the pleadings, we must accept as true "all well-pleaded facts and all reasonable inferences drawn therefrom" alleged by the party opposing the motion. *McClenahan v. Cooley*, 806 S.W.2d 767, 769 (Tenn. 1991). In addition, "[c]onclusions of law are not admitted nor should judgment on the pleadings be granted unless the moving party is clearly entitled to judgment." *Id*.

*Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466, 470 (Tenn. 2004). "We should uphold granting the motion only when it appears that the plaintiff can prove no set of facts in support of a claim that will entitle him or her to relief." *Young v. Barrow*, 130

S.W.3d 59, 63 (Tenn. Ct. App. 2003). Our standard of review is *de novo* with no presumption of correctness as to the Trial Court's decision. *Id.*

We first address whether the Trial Court erred in ruling that the GTLA precludes recovery against governmental entities for injuries proximately caused by the grossly negligent or reckless conduct of their employees within the scope of their employment under Tenn. Code Ann. § 29-20-205. The GTLA, enacted in 1973, provides for the removal of governmental immunity for tortious conduct by governmental actors in certain circumstances. "Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment …" Tenn. Code Ann. § 29-20-205 (2012). This Court has stated:

> The GTLA is premised on the constitutional rule that suits against the State and governmental entities "may only be brought in such manner and 'in such courts as the Legislature may by law direct.' " *Vaughn v. City of Tullahoma*, No. M2015-02441-COA-R3-CV, 2017 WL 3149602, at *1 (Tenn. Ct. App. July 21, 2017) (quoting Tenn. Const. art. I, § 17). Provisions of the GTLA are subject to strict construction because the Act is in contravention of the common-law doctrine of sovereign immunity. *Moreno v. City of Clarksville*, 479 S.W.3d 795, 809-10 (Tenn. 2015). Therefore, in cases brought pursuant to the GTLA, "[b]efore proceeding in an action against a governmental entity, the threshold issue of waiver of governmental immunity must be addressed." *Brown v. Hamilton Cty.*, 126 S.W.3d 43, 46 (Tenn. Ct. App. 2003).

*Lawson v. Maryville City Schools*, No. E2019-02194-COA-R3-CV, 2020 WL 7391151, at *3 (Tenn. Ct. App. Dec. 14, 2020), *no appl. perm. appeal filed*. If governmental immunity is removed pursuant to the GTLA, courts proceed to another step in their analysis. We have explained that "[i]f the GTLA removes immunity, then the common law rule of immunity under the Public Duty Doctrine provides an additional layer of defense and is the next level of inquiry for the court." *Kimble v. Dyer Cnty. Tennessee*, No. W2019-02042-COA-R3-CV, 2020 WL 7389381, at *4 (Tenn. Ct. App. Dec. 16, 2020), *R. 11 perm. app. denied April 7, 2021*. The public duty doctrine, which has lived on in our law alongside the GTLA, "is a common law defense that shields public employees from suits for injuries that are caused by the employee's breach of a duty owed to the public at large rather than to the individual plaintiff, and it likewise shields local governmental entities from such liability." *Id*. (citing *Ezell v. Cockrell*, 902 S.W.2d 394, 397 (Tenn. 1995)). Our Supreme Court has articulated the circumstances in which a special duty exception exists such that a governmental entity may not rely upon the public duty doctrine for immunity:

[A] special duty of care exists when 1) officials, by their actions, affirmatively undertake to protect the plaintiff, and the plaintiff relies upon the undertaking; 2) a statute specifically provides for a cause of action against an official or municipality for injuries resulting to a particular class of individuals, of which the plaintiff is a member, from failure to enforce certain laws; or 3) the plaintiff alleges a cause of action involving intent, malice, or reckless misconduct.

*Ezell*, 902 S.W.2d at 402.

Returning to the present case, the Trial Court held that Plaintiffs' claims of simple negligence removed Defendants' immunity (at least before application of the public duty doctrine). However, the Trial Court held that Plaintiffs' claims could not proceed insofar as they alleged reckless conduct. Plaintiffs argue that the Trial Court erred in effectively holding that claims of recklessness may never proceed against governmental entities under the GTLA. Plaintiffs rely chiefly on *Brown v. Hamilton Cnty.*, 126 S.W.3d 43 (Tenn. Ct. App. 2003), which involved a person who was killed by an individual out on supervised release pending trial. The trial court in *Brown* ruled for the County defendant. On appeal, we reversed the trial court and found, among other things, that a special duty exception applied to remove the case from the public duty doctrine. We stated:

> The Trial Court ruled that the acts on behalf of the County were discretionary functions rendering the County immune, and further ruled that there was no evidence that the defendant "acted with intent, malice or reckless conduct" to take this case out of the public duty doctrine….
>
> ***
>
> Reckless conduct is defined as taking place "when a person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Gardner v. Insura Property & Cas. Ins. Co.*, 956 S.W.2d 1, 3 (Tenn. Ct. App. 1997). The evidence in the record compels the conclusion that defendant's implementation of the program with respect to Evay Kelley[2] constituted a substantial and unjustifiable risk, such as the defendant's conduct is deemed reckless under the special duty exception. The staff did not know Kelly's employment status when he entered the program or at the time of the murder. No records of activity/whereabouts at all for June 5-8, June 16-23 and July

---

[2] Kelley's name is spelled various ways in *Brown*.

-10-

5-6 were available. Kelly was in violation of the program well over half of the fifty days involved before the murder. Grounds to revoke his status as early as July 1, one month before murder were present. Kelly was warned on the July 8 meeting, but there is no record verifying where he was. He was not asked his whereabouts during the unauthorized absences. There were over 32 absences unapproved, and at least 17 were not documented in any fashion. The policy was to revoke for any absence (permitted "not one single time"). At the time of the murder, there had been at least three overnight absences and no attempts were made to verify Kelly's accounts of where he was by talking with anyone, such as his mother or father to confirm his story. During the absence for approximately 48 hours before Petersen's murder, Brown called Kelly's house twice on August 6 and 7. No follow up or effort was made to locate Kelly when there was no response to the phone calls, and significantly, Kelly was never asked or checked about carrying a weapon, despite the charges against him.

The preponderance of evidence in the record points to extreme dereliction by the County in the operation of its program, and such neglect of duty substantially and unjustifiably increased the risk that harm would occur. The evidence supports findings of reckless misconduct and omissions sufficient to come within the exception to the public duty rule, and remove the defendant's immunity from liability for these actions.

The issue thus becomes whether the plaintiff has shown the elements of a negligence claim under the GTLA as outlined in *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997). The defendant overlooked thirty-two violations, completely unmonitored Kelley for several days because equipment was out of operation, and in our view unreasonably accepted Kelley's excuses for absences and failed to insist upon documentation or make any reasonable attempt to verify his stories and take steps to remove Kelley from the program. Moreover, nothing was done when he was absent for overnight periods. While Brown had a heavy case load, he denied that the number of people impeded his ability to execute his job duties.

*Brown*, 126 S.W.3d at 46, 49-50 (footnote added).

In response, Hawkins County and the EMA argue that *Brown* contradicts the statutory scheme of the GTLA and is something of an outlier. These Defendants contend that the GTLA makes no provision for removal of governmental liability for heightened forms of negligence as opposed to simple negligence. They cite to *Harp v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2012-02047-COA-R3-CV, 2014 WL 265713 (Tenn.

Ct App. Jan. 22, 2014), *R. 11 perm. app. denied May 13, 2014*, wherein this Court articulated the decisive issue as whether the alleged conduct was reckless or simply negligent; if it were the latter, governmental immunity was removed. If it were the former, governmental immunity would stand. In *Harp*, we discussed as follows, in part:

> The parties do not dispute that Ms. Sherrill's operation of the school bus in such a way as to hit Mr. Harp proximately caused his injuries or that Ms. Sherrill's actions occurred in the course and scope of her employment. Whether Metro's immunity is removed, therefore, depends on how we classify Ms. Sherrill's actions. If she was negligent in her operation of the school bus, then Metro's immunity from suit would be lifted under Tennessee Code Annotated sections 29-20-202(a) and -205. If, however, Ms. Sherrill's actions constituted more than mere negligence-e.g., gross negligence, willfulness, or recklessness, as Metro argues-then neither statutory section would operate to remove immunity, and the Harps' suit may proceed only against Ms. Sherrill. *See Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 369 (Tenn. 2011). Stated another way, did Ms. Sherrill fail to exercise reasonable care, or did she display "'a conscious neglect of duty or a callous indifference to consequences'"? *Conroy v. City of Dickson*, 49 S.W.3d 868, 871 (Tenn. Ct. App. 2001) (quoting *Thomason v. Wayne Cnty.*, 611 S.W.2d 585, 587 (Tenn. Ct. App. 1980)) (defining gross negligence).

> ***

> Though Metro conceded at oral argument that the record contains evidence that Ms. Sherrill's conduct was "merely negligent," Metro contends that the results of a post-accident drug test that Ms. Sherrill took indicating that her urine sample tested positive for marijuana and cocaine establish that her conduct was reckless. However, there was no evidence before the trial court that Ms. Sherrill was impaired at the time of the collision with Mr. Harp, no evidence explaining the impact the levels of substances contained in the drug screen would have on her ability to drive, and no evidence that Ms. Sherrill drove the bus erratically or that the substances reflected in the positive drug screen impacted her activities on the date of the accident. Mr. Harp described Ms. Sherrill's demeanor after the accident as "out of it" and "dippy," but opined that those were general descriptions of her usual personality….

> ***

-12-

Ms. Sherrill denied using illegal drugs on the day of the accident. When questioned about the positive drug test results, Ms. Sherrill stated that they were unexpected because she does not use illegal drugs, but that she lacked the financial resources to challenge the drug screen. We credit the trial court's finding that the evidence fell short of establishing that Ms. Sherrill was more probably than not under the influence of drugs at the time of the accident. Furthermore, the evidence does not support a finding that her conduct was willful, reckless, or grossly negligent.

Based on the record before us, we conclude that the evidence does not preponderate against the trial court's finding that Ms. Sherrill acted negligently in the operation of the bus and by failing to see Mr. Harp. Consequently, Metro is not entitled to the protections of governmental immunity and Ms. Sherrill is immune from suit. We, therefore, affirm.

*Harp*, 2014 WL 265713, at *3-5 (footnotes omitted).

In *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352 (Tenn. 2011), our Supreme Court held that while the government employee's conduct therein fell within the scope of his employment, his operation of the equipment at issue constituted the intentional tort of assault rather than negligence. Our Supreme Court explained that the governmental entity involved thus could not be held liable under the GTLA barring proof of negligent supervision. The *Hughes* Court discussed, in part:

In *Limbaugh*, a resident made a direct showing that the defendant nursing home, a governmental entity, had failed "to take reasonable precautions to protect its residents from the risk of abuse by th[e] aggressive nursing assistant" who committed an assault against the resident. *Id.* Because the governmental entity negligently supervised its employee, and the resident suffered an injury from an intentional tort, assault and battery, not included in the enumerated list in section 29-20-205(2), we held that the governmental entity's immunity from suit was removed. *Id.* Since 2001, the Court of Appeals has correctly interpreted *Limbaugh* to mean that "the GTLA does not allow plaintiffs to hold governmental entities vicariously liable for intentional torts not exempted under section 29-20-205(2), but rather requires a direct showing [of] negligence on the part of the governmental entity." *Pendleton v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2004-01910-COA-R3-CV, 2005 WL 2138240, at *3 (Tenn. Ct. App. Sept. 1, 2005); *see also Baines v. Wilson Cnty.*, 86 S.W.3d 575, 581 (Tenn. Ct. App. 2002). Because an assault or a battery is not a negligent act, *see Limbaugh*, 59 S.W.3d at 84, the "negligent act or omission" required to

-13-

waive immunity under section 29-20-205 does not refer to the intentional tort. When, therefore, there has been no showing of negligence by the governmental entity in supervision of one of its employees acting within the scope of employment, the exception to sovereign immunity set forth in section 29-20-205 will not apply. As the Court of Appeals observed in the case before us, the trial court concluded that the Plaintiff " 'failed to prove negligent supervision,' and this finding is not challenged on appeal." *Hughes*, 2010 WL 424240, at *12.

Whether Metro's immunity is waived, therefore, depends on how we classify the Defendant's action. If the Defendant was negligent in his operation of the front-end loader, then Metro's immunity from suit would be removed under both Tennessee Code Annotated sections 29-20-202(a) and 205. If the Defendant committed an assault, however, then neither of those sections would operate to remove immunity, and the Plaintiff's suit may proceed only as to the Defendant.

***

Because the evidence establishes that the Defendant intended to frighten the Plaintiff and perhaps others walking along the access road, he committed the intentional tort of assault. Evidence that the Defendant merely acted negligently in the operation of the front-end loader does not preponderate against the other findings of fact by the trial court. Further, there is no evidence that Metro was negligent in supervising the Defendant. Metro is, therefore, entitled to the protections of governmental immunity. The Plaintiff is, however, entitled to compensation from the Defendant for his injuries. The cause is, therefore, remanded for the entry of judgment.

*Hughes*, 340 S.W.3d at 368-69, 371-372. The case now before us does not involve a claim of an intentional tort as did *Hughes.* We note the following description of what sets negligent conduct apart from intentional conduct:

While the absence of intent is essential to the legal concept of negligence, the presence of an intent to do an act does not preclude negligence. The distinguishing factor between intentional tortious conduct and negligent conduct is that the intentional actor has the desire to bring about the consequences that follow or the substantial certainty that they will occur, while a negligent actor does not desire to bring about the consequences which follow, nor does he or she know that they are substantially certain to occur, or believe that they will; there is merely a risk of such consequences,

-14-

sufficiently great to lead a reasonable person in his or her position to anticipate them, and to guard against them. Thus, the principal difference between negligent and intentional conduct is a difference in the probability, under the circumstances known to the actor and according to common experience, that certain consequence or a class of consequences will follow from a certain act.

57A Am.Jur.2d Negligence § 30 (footnotes omitted); *see also Holder v. Shelby Cnty.*, No. W2014-01910-COA-R3-CV, 2015 WL 1828015, at *6 (Tenn. Ct. App. April 21, 2015), *no appl. perm. appeal filed*.

This issue requires us to delineate the distinct concepts of negligence, gross negligence, and recklessness. Our Supreme Court has defined negligence thusly: "In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: '(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause.' " *Giggers v. Memphis Housing Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). This Court has described gross negligence as a "negligent act done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003) (quoting *Odum v. Haynes*, 494 S.W.2d 795, 807 (Tenn. Ct. App. 1972)). Our Supreme Court has described the third concept at issue, recklessness, as occurring "when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). In addition, our Supreme Court has discussed the state of mind attendant to recklessness as follows:

Recklessness is a hybrid concept which resembles both negligence and intent, yet which is distinct from both and can be reduced to neither. "A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Hodges*, 833 S.W.2d at 901. Although the reckless actor intends to act or not to act, the reckless actor lacks the "conscious objective or desire" to engage in harmful conduct or to cause a harmful result. *See State v. Kimbrough*, 924 S.W.2d 888, 891 (Tenn. 1996) ("[R]ecklessness and negligence are incompatible with desire or intention."); Dobbs § 147, at 351 (The reckless actor "does not intentionally harm another, but he intentionally or consciously runs a very serious risk with no good reason to do so."). Nevertheless, recklessness contains an

awareness component similar to intentional conduct which is not demanded of negligence. *See* Dobbs § 147, at 351 (Recklessness "entails a mental element that is not necessarily required to establish gross negligence."); *Brady*, at 384 ("The element of awareness of risk ... does distinguish between recklessness and negligence.").

*Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 38 (Tenn. 2005).

As shown by the authorities above, the concepts of negligence, gross negligence, and recklessness are related. One who acts with gross negligence necessarily also has acted negligently. In addition, one who acts recklessly deviates grossly from the standard of care while lacking the conscious desire to cause the underlying harm, a scenario encompassing but not necessarily coextensive with negligent conduct. In short, conceptually distinct though it is, simple negligence is a subspecies of these heightened forms of negligence, and in turn, these concepts contrast with intentional torts. The GTLA does not exclude claims based on heightened forms of negligence. Indeed, the statute pertaining to immunity for emergency communications districts, as pertinent to Defendant ECD-911, establishes gross negligence as the standard for removal of governmental immunity as to members of emergency communication district boards, stating as relevant: "Emergency communications district boards, established in § 7-86-105, and the members of such board shall be immune from any claim, complaint or suit of any nature which relates to or arises from the conduct of the affairs of the board except in cases of gross negligence by such board or its members." Tenn. Code Ann. § 29-20-108 (2012).[3] In addition, the third special duty exception to the public duty doctrine explicitly includes "reckless" conduct. *See Karnes v. Madison Cnty.*, No. W2009-02476-COA-R3-CV, 2010 WL 3716458, at *6 (Tenn. Ct. App. Sept. 23, 2010), *no appl. perm. appeal filed* ("[T]o the extent that the Defendant's conduct could be deemed reckless, Madison County is not immune from liability under the public duty doctrine and Plaintiff stated a claim upon which relief could be granted"). Defendants contend that particular special duty exception is applicable only to individual defendants. However, we find no legal basis for that interpretation; the caselaw reflects that it is one of the three special duty exceptions without qualification or subcategorization. In that light, it would make little sense for a special duty exception to the public duty doctrine to explicitly include reckless conduct if claims of reckless conduct against governmental entities could never proceed in the first place.

*Brown* stands for the proposition that a plaintiff's claims based upon reckless conduct may proceed under the GTLA. Nevertheless, Defendants invite us to disregard

---

[3] A recent amendment to this statute, effective January 1, 2021, does not affect our disposition of this appeal.

*Brown* as an outlier. We decline to do so. *Brown,* a published opinion, remains good law and has never been overturned, either judicially or legislatively. Should *Harp* prove incompatible with *Brown*, we look to the latter for guidance as it is a published opinion of this Court and the former is not. However, *Harp* may not be as irreconcilable with *Brown* as Defendants suggest. *Harp* appears to stand for the proposition that gross negligence, willfulness, or recklessness cannot operate to remove governmental immunity under the GTLA. To the extent *Harp* is categorical about that, we disagree. Nevertheless, the scenario of *Harp* is rather different from the present case. Here, there is no hint that Defendants' employees were on drugs or otherwise intoxicated on the night of Decedent's death. Rather, the claim by Plaintiffs is that Defendants' employees responded or failed to respond as they did on the night in question because of the Defendant entities' nepotistic hiring practices, failure to train, failure to maintain licensure, etc. Plaintiffs' allegations are of systemic failure on the part of the governmental entities rather than solely conduct from individual governmental employees. That is so whether Plaintiffs' claims are couched as negligence, gross negligence, or recklessness. They are all tethered to the alleged failures of the Defendant entities, not just the employees. It is difficult to imagine that our General Assembly intended to remove governmental immunity for simple negligence, but preserve governmental immunity for recklessness or gross negligence. This would perversely incentivize government, should it commit a negligent act, to commit worse forms of negligence so as to remain immune. Under the GTLA, and consistent with our holding in *Brown*, Plaintiffs could proceed with their claims (including their claims encompassing simple negligence if they have sufficiently pled claims of recklessness or gross negligence—heightened forms of negligence) against Defendants; the Trial Court erred in holding otherwise. Having held that Plaintiffs' claims of heightened negligence *could* proceed against Defendants, an issue exists as to whether Plaintiffs sufficiently pled heightened negligence.

We next address whether the Trial Court erred in finding that the facts pled were sufficient to state a claim based upon recklessness. At the judgment on the pleadings stage, we afford Plaintiffs' complaint a highly deferential reading and assume its factual allegations and all reasonable inferences drawn from those facts are true. To be sure, Plaintiffs characterized Defendants' conduct as reckless. However, that is a legal conclusion. The *Kimble* court discussed how a plaintiff's characterization of conduct as reckless in her complaint does not necessarily mean as a matter of law that the conduct at issue could arise to reckless. We stated:

> Turning to the third special duty exception to the Public Duty Doctrine, i.e., that Deputy John Doe engaged in reckless misconduct, as set out in context above, in his complaint, Mr. Kimble avers that Deputy Doe's "actions of leaving an unguarded, dangerous roadway hazard was reckless ..., [i.e.,] was [a] reckless performance of duty to render aid to another in

-17-

distress." Mr. Kimble further avers that Deputy John Doe's "inaction was reckless." Although Mr. Kimble characterizes Deputy John Doe's action/inaction as reckless, this is a legal conclusion. As such, we are not constrained to accept or infer that Deputy Doe's conduct was, in fact, reckless; rather, the facts set out in the complaint must show a level of culpability beyond mere negligence….

\*\*\*

Although Mr. Kimble avers that Deputy John Doe was reckless in failing to place some "sign or signal of a hazardous situation," such assertions do not rise to the level of a "gross of reckless deviation from the reasonable standard of care." *Id*. Taking Mr. Kimble's factual allegations as true and giving all reasonable inferences in his favor, at most, he has pled that Deputy John Doe breached a duty to the general public when he left the scene of one downed tree to go to another. Because Mr. Kimble's complaint does not establish a special duty exception to the Public Duty Doctrine, his claim fails.

*Kimble*, 2020 WL 7389381, at \*6, 8.

Thus, we look to the facts pled by Plaintiffs and all reasonable inferences drawn from those facts, not simply Plaintiffs' characterizations of those facts. Among Plaintiffs' factual allegations were these: that Officer Godsey blatantly refused to follow any protocol in assessing the situation; that ECD-911 failed or blatantly refused to obtain more information or make any additional calls to other emergency personnel; and that the EMA failed or blatantly refused to take any action at all beyond communicating to the power company that a utility pole was down. Plaintiffs also alleged that Defendants were on notice and consciously aware that Highway 70 had an active mudslide constituting a severe road hazard and waited almost an hour to make any effort whatsoever to close down the highway. As opposed to *Kimble*, this is not merely a matter of second-guessing the priorities of government officials. It is about a wholesale failure to train. At the judgment on the pleadings stage, these allegations and all reasonable inferences drawn from them must be taken as true. Plaintiffs' allegations reflect that Defendants were aware of but consciously disregarded a substantial and unjustifiable risk, the disregard of which represented a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. In other words, Plaintiffs pled facts sufficient to state a claim based upon recklessness, and the Trial Court did not err in so holding. Taking Plaintiffs' allegations against Defendants as true, again as we must at this stage, the allegations further show negligent acts done with utter unconcern for the safety of others or done with a reckless disregard for the rights of others so as to imply conscious indifference to consequences. We therefore hold that Plaintiffs' claims of gross negligence

are sufficiently stated, as well. Plaintiffs have, as a matter of law, sufficiently pled these heightened forms of negligence in their complaint.

The final issue we address is whether the Trial Court erred in its analysis of Plaintiffs' claims under the common law defense of the public duty doctrine and the special duty exception. We have no difficulty concluding that Defendants' duties with respect to how to respond to the highway washout were duties owed to the public at large and not just to Decedent individually. *See Brown*, 126 S.W.3d at 48 ("a duty owed to everyone is a duty owed to no one," quoting favorably from the County's brief). At this stage of the proceedings, we hold that the public duty doctrine applies subject to any special duty exceptions. Plaintiffs contend that a special duty exception to the public duty doctrine exists here. Specifically, Plaintiffs point to the third special duty exception whereby a plaintiff alleges a cause of action involving intent, malice, or reckless misconduct. As we have discussed, Plaintiffs successfully stated claims of recklessness and gross negligence. Therefore, based upon Plaintiffs' allegations taken as true, the third special duty exception to the public duty doctrine would apply to remove Defendants' immunity from liability. In accordance with *Brown*, Plaintiffs still must prove their claims of reckless misconduct or gross negligence in order for the third special duty exception to the public duty doctrine to apply such that they may then proceed to establish the elements of their negligence claims under the GTLA. Whether Plaintiffs will prevail in that effort is not before us at this stage of the proceedings and we take no position on the merits of this case. We hold only that Plaintiffs' lawsuit survives Defendants' motions for judgment on the pleadings as we do not find that "[Plaintiffs] can prove no set of facts in support of a claim that will entitle [them] to relief." *Young*, 130 S.W.3d at 63. We reverse the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees, Hawkins County Emergency Communications District Board; Hawkins County, Tennessee; and Hawkins County Emergency Management Agency.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-19-